# EXHIBIT 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGES COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> GARFIELD TAYLOR, INC., et al., <br><br> Defendants. | Case: 1:11-cv-2054 (RLW) |

ANSWERS OF GARFIELD TAYLOR TO COMPLAINT

Defendant Garfield Taylor ("Garfield"),[1] *pro se*, answers the Complaint filed by

Plaintiff United States Securities and Exchange Commission (the "Commission") by

denying that the promissory notes were securities, denying all allegations that are legal

conclusions, and denying all allegations not expressly admitted.  Taylor further states:

### SUMMARY

I.        *This case involves a Ponzi scheme and offering fraud in which
Defendant Garfield M. Taylor, operating through two entities that he controlled
— Garfield Taylor, Incorporated ("GTI") and Gibraltar Asset Management Group,
LLC ("GAM") — defrauded over 130 investors, primarily middle-class residents
and charitable organizations in the Washington, D.C. metropolitan area, of more
than $27 million from at least 2005 until 2010. Garfield Taylor orchestrated the
frauds with the assistance of Defendants Benjamin C. Dailey ("Dailey"), Jeffrey A.
King ("King"), William B. Mitchell ("Mitchell"), Maurice G. Taylor, and Randolph
M. Taylor.*

**Answer:**    Garfield denies the allegations in paragraph 1.

2.        *Garfield Taylor and his companies GTI and GAM lured their
targets into investing in promissory notes issued by GTI and GAM by persuading
them, through material misrepresentations and omissions, that they could earn
above-market rates of return (generally around 20% annually) with little or no
risk through a covered call investment strategy and principal protection*

---

[1] Because there is more than one party with the last name of Taylor, Garfield
uses his first name in this Answer and also refers to those defendants with the last name
of Taylor by their first names.

techniques that Garfield Taylor claimed to be using. Garfield Taylor, in fact, told some investors that their investments with GTI and GAM were like bank accounts insured by the Federal Deposit Insurance Corporation ("FDIC"). In reality, the investment funds that Garfield Taylor did trade were generally placed in highly risky naked options and were, for the most part, lost. Other investors' funds were paid out to earlier investors as purported interest payments in the manner of a Ponzi scheme.

**Answer:** Garfield denies that he made "material misrepresentations and

omissions"; therefore, he denies all allegations in paragraph 2.

3.      In order to maintain a steady flow of new investor money, Garfield Taylor induced current investors and others, including King and Mitchell (neither of whom was a licensed securities broker), to solicit and refer new investors to him in exchange for commission payments based on the amounts invested. In addition, Garfield Taylor, who was not a licensed securities broker, persuaded several individuals to give him online access to their personal brokerage accounts for the purpose of placing trades in exchange for a share of any profits generated.

**Answer:** Garfield denies the allegations in the first sentence of paragraph 3 and

denies as phrased the last sentence.

4.      The scheme ultimately collapsed in the fall of 2010 when GTI's and GAM's accounts were depleted through losses in speculative trading, interest payments to investors, and misappropriation of investor funds for Garfield Taylor's personal use and for distribution to the other Defendants and others.

**Answer:** Garfield denies that he engaged in a "scheme" or that he

"misappropriated" investor funds; therefore, he denies all allegations in paragraph 4.

5.      As a result of the conduct alleged herein:

a.   GTI and GAM violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b.   Garfield Taylor directly violated Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. §

Garfield Taylor's Answer to Complaint
Page 3 of 33

240.10b-5], and Sections 206(1), 206(2) and 206(4) of the
Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C.
§§ 80b-6(1), (2) and (4)] and Rule 206(4)-8 thereunder [17 C.F.R.
§ 206(4)-8]. Garfield Taylor aided and abetted GTI's and GAM's
violations of Section 10(b) of the Exchange Act and Rule 10b-5
thereunder and acted as a "controlling person" of GTI and GAM
within the meaning of Section 20(a) of the Exchange Act [15
U.S.C. § 78t(a)] in connection with GTI's and GAM's violations of
Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

c.   Dailey directly violated Section 17(a) of the Securities
Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15
U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-
5]. Dally also aided and abetted GAM's violations of Section
10(b) of the Exchange Act and Rule 10b-5 thereunder;

d.   King directly violated Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)] and Section 15(a) of the Exchange Act [15
U.S.C. § 78o(a)]. King also aided and abetted GAM's violations of
Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

e.   Randolph Taylor directly violated Section 17(a) of the
Securities Act [15 U.S.C. § 77q(a)]. Randolph Taylor also aided
and abetted GAM's violations of Section 10(b) of the Exchange
Act and Rule 10b-5 thereunder;

f.   Maurice Taylor violated Section 17(a) of the Securities
Act [15 U.S.C. § 77q(a)];

g.   Mitchell violated Section 15(a) of the Exchange Act [15
U.S.C. § 78o(a)]; and

h.   The Relief Defendants, The King Group, LLC, Marketing
and Financial Consultants, Inc. and Reverb Enterprises, LLC,
received funds from Defendants for which they gave no
consideration and to which they have no right or legitimate
claim.

**Answer:**   Garfield denies the allegations in paragraph 5 that relate to him. With

respect to the allegations unrelated to him, Garfield lacks knowledge or information

sufficient to form a belief about the truth of the allegations.

6.   In this action, the Commission asks the Court to enjoin GTI,
GAM, Garfield Taylor, Dailey, King, Maurice Taylor, Randolph Taylor and
Mitchell from future violations, require disgorgement of Defendants' and Relief

*Defendants' ill-gotten gains and require Defendants to pay civil penalties.*

**Answer:** Garfield asserts that the Commission is not entitled to the relief it

seeks.

## DEFENDANTS

7.      *Garfield Taylor, Incorporated ("GTI") is a Maryland corporation with its principal office in Washington, D.C. It is wholly owned and controlled by Garfield Taylor and purported to offer various services, including real estate development and construction, options trading, and mortgage marketing.*

**Answer:** Garfield admits the following: (i) GTI was a Maryland corporation; (ii)

its principal office was in Washington, D.C.; and (iii) it was wholly owned and controlled

by Garfield. Garfield denies that GTI offered services other than real estate

development and construction.

8.      *Gibraltar Asset Management Group, LLC ("GAM") is a Virginia limited liability company with its principal office in Washington, D.C. GAM was founded in May 2008 by Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor. GAM purported to be in the business of investing in covered call options.*

- **GAM – deny "purported to be in the business of investing in covered call options."**

**Answer:** Garfield admits the following: (i) GAM was a Virginia LLC; (ii) its

principal office was in Washington, D.C.; and (iii) it was found in May 2008 by the named

parties. Garfield denies as phrased the last sentence in paragraph 8.

9.      *Garfield M. Taylor is a resident of North Bethesda, Maryland. He is the founder, Chief Executive Officer ("CEO"), and sole owner of GTI and is the Chairman, CEO, and the controlling member of GAM.*

**Answer:** Admitted.

10.      *Jeffrey A. King is a resident of Upper Marlboro, Maryland. In late 2007, King was an independent contractor for GTI. King later was a*

*founding member of GAM, and served as the company's President and Chief Operating Officer prior to his resignation from the company in February 2009. King formerly held a 15% ownership interest in GAM, which was redeemed upon his resignation. King is the sole owner of Relief Defendant The King Group, LLC.*

**Answer:**   Upon belief, Garfield admits the allegations in the first, second, third,

and fourth sentence in paragraph 10.  Garfield lacks knowledge or information sufficient

to form a belief about the truth of the allegations in the last sentence.

11.   *Benjamin C. Dailey is a resident of Washington, D.C. Dailey is a founding member of GAM and was the company's Vice President for Operations prior to his resignation in or about August 2009. Dailey holds or held a 5% ownership interest in GAM. He is a co-owner of Relief Defendant Reverb Enterprises, LLC.*

**Answer:**   Garfield lacks knowledge or information sufficient to form a belief

about the allegations in the first and last sentence of paragraph 11.  Upon belief,

Garfield admits the allegations in the second and third sentence.

12.   *Randolph M. Taylor is a resident of Washington, D.C. He is Garfield Taylor's nephew. He is also Dalley's childhood friend and business partner. Randolph Taylor is a founding member of GAM and was Vice President for Organizational Development prior to his resignation in or about August 2009. He holds or held a 5% ownership interest in GAM. He is a co-owner of Relief Defendant Reverb Enterprises, LLC.*

**Answer:**   Garfield lacks knowledge or information sufficient to form a belief

about Randolph's friendship with Dalley or Randolph's ownership interest in "Reverb

Enterprises, LLC." Upon belief, Garfield admits the following: (i) Randolph is a D. C.

resident; (ii) Randolph is Garfield's nephew; (iii) Randolph is a founding member of GAM

and was Vice President for Organizational Development; and (iv) Randolph holds or held a 5%

ownership interest in GAM.

13.   *Maurice G. Taylor is a resident of Bowie, Maryland. Maurice Taylor is Garfield Taylor's brother and is married to King's sister. Maurice Taylor*

Garfield Taylor's Answer to Complaint
Page 6 of 33

> is the Chief Investment Officer for GAM and holds a 10% ownership interest in
> GAM. He also worked as a securities trader for GTI. Prior to working for GTI and
> GAM, he was associated with Redwood Securities and held Series 7, 24, and 63
> securities licenses. Maurice Taylor's registration with Redwood Securities was
> terminated in January 2004.

**Answer:**   Garfield admits the first three sentences in paragraph 12. Garfield

denies as phrased the allegations in the fourth sentence related to "securities trader."  With

respect to the allegations related to "Redwood Securities," Garfield lacks knowledge or

information sufficient to form a belief about the truth of the allegations.

> 14.      *William B. Mitchell is a resident of Middle River, Maryland.*
> *Mitchell worked for GTI as its Vice President for Finance from May 2004 to*
> *November 2005 and rejoined GTI as an independent contractor in 2009. From*
> *July 2008 through February 2009, Mitchell worked for GAM as Executive Vice*
> *President of Strategic Planning. In February 2009, he replaced King as President*
> *of GAM and held that position through at least August 2009. Mitchell is the*
> *President and sole owner of Relief Defendant Marketing and Financial*
> *Consultants, Inc.*

**Answer:**  Garfield lacks knowledge or information sufficient to form a belief

about the allegations in the first sentence in paragraph 14. Upon belief, Garfield admits

the allegations in the second, third, and fourth sentence. Garfield lacks knowledge or

information sufficient to form a belief about the truth of the last sentence.

### RELIEF DEFENDANTS

> 15.      *Marketing and Financial Consultants, Inc. ("Marketing and*
> *Financial"), is a Maryland corporation with its principal office in Baltimore,*
> *Maryland. Marketing and Financial is wholly owned and controlled by Mitchell.*
> *Marketing and Financial received investor funds from GTI for which it had no*
> *right or legitimate claim.*

**Answer:**   Garfield lacks knowledge or information sufficient to form a belief

about the truth of the allegations in the first and second sentence of paragraph 15.

Garfield denies the allegations in the last sentence.

16.    *The King Group, LLC ("King Group"), is a Maryland limited liability company with its principal office in Upper Marlboro, Maryland. King Group is wholly owned and controlled by King. King Group received investor funds from GTI for which it had no right or legitimate claim.*

**Answer:**  Garfield lacks knowledge or information sufficient to form a belief

about the truth of the first three sentences in paragraph 16. Garfield denies the

allegations in the last sentence.

17.    *Reverb Enterprises, LLC ("Reverb"), is a District of Columbia limited liability company with its principal office in Washington, D.C. Reverb is jointly owned and controlled by Dailey and Randolph Taylor. Reverb received investor funds from GAM and GTI in the form of loans that were later assumed by Garfield Taylor without adequate consideration. Reverb had no right or legitimate claim to these payments.*

**Answer:**  Garfield lacks knowledge or information sufficient to form a belief

about the truth of the first three sentences in paragraph 17. Garfield denies the

allegations in the last sentence.

## JURISDICTION

18.    *This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa] and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e) and 80b-14]. Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint*

**Answer:**  The allegations in paragraph 18 are legal conclusions to which Garfield

is not required to respond.

19.    *Venue is appropriate in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because certain acts or transactions constituting the violations alleged in this Complaint occurred in this judicial district, and many of the offers and sales of securities in the form of promissory notes took place in this district. GTI and GAM have their principal places of business in this district. In addition, certain of the Defendants, Dailey*

Garfield Taylor's Answer to Complaint
Page 8 of 33

and Randolph Taylor, reside and transact business in this district.

**Answer:**   The allegations in paragraph 19 are legal conclusions to which

Garfield is not required to respond.  Garfield denies that the promissory notes were

securities or that he violated the law.

## FACTS

### I.  Garfield Taylor, Incorporated

20.      *Garfield Taylor established GTI in 2000 and has been the
company's CEO and sole shareholder since that time. Garfield Taylor promoted
GTI- as a multi-faceted business engaged in construction, real estate, securities
trading, mortgage marketing, wealth management, and accounting services. In
reality, GTI's primary focus and source of revenue was high-risk options trading
by Garfield and Maurice Taylor.*

**Answer:**   Garfield admits the allegations in the first sentence of paragraph 20

but denies as phrased the remaining allegations.

21.      *This trading, however, was generally not profitable, and any
trading profits generated by the company were overwhelmed by losses. As a
result, GTI has operated at a net loss since at least 2005.*

**Answer:**  Denied.

### A.      GTI's Unregistered Securities Offering and Solicitation of Investors

22.      *GTI and Garfield Taylor offered and sold securities to investors in
the form of promissory notes, in which the company purportedly promised
above-market interest rates, generally around 20 percent per year. Garfield
Taylor represented to numerous GTI investors that he would invest the principal
of their promissory notes using a strategy of selling covered call options.*

**Answer:**  Denied.

23.      *The promissory notes issued by GTI are securities under Section
2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the
Exchange Act [15 U.S.C. § 78c(a)(10)]. The money provided to GTI was
consideration for a contract, transaction, or scheme whereby parties invested in
a common enterprise that was offered, sold and/or promoted by GTI and*

*Garfield Taylor with the expectation of profits derived through the efforts of others.*

**Answer:** Garfield denies that the promissory notes were "securities";

therefore, he denies the remaining allegations in paragraph 23.

24.   *From at least 2005 until 2010, GTI and Garfield Taylor offered and sold these unregistered securities to over 112 investors and obtained more than $15.7 million.*

**Answer:** Garfield denies that he offered or sold "securities"; therefore

he denies the remaining allegations in paragraph 24.

25.   *GTI never filed a registration statement with the Commission, and it did not provide investors with an offering memorandum or audited .financial statements. Furthermore, investors were not required to meet any eligibility requirements in order to invest in GTI. Many of GTI's investors had little or no investment experience and had invested their life savings with GIT or had taken equity out of their homes in order to invest.*

**Answer:** Garfield admits the first sentence in paragraph 25.  Garfield lacks

knowledge or information sufficient to form a belief about the truth of the remaining

allegations.

26.   *GTI paid interest to most investors on a monthly basis, but some investors opted to "roll over" their notes and reinvest their interest payments.*

**Answer:** Admitted.

27.   *Garfield Taylor and GTI solicited investors by primarily targeting middle-class residents and charitable organizations in the Washington, D.C. metropolitan area (including Maryland and Virginia). In order to promote the sale of the GTI promissory notes, Garfield Taylor and GTI solicited investors in and outside Washington, D.C. over the telephone and in face-to-face meeting& In addition, Garfield Taylor and GTI caused some of the investors [to] wire[] money to GTI for their investments through financial institutions outside Washington, D.C.*

**Answer:** Garfield denies as phrased that he "solicited" investors; therefore, he

denies all allegations related to "solicited" in paragraph 27.  Garfield denies as phrased

the last sentence.

28.      *To attract new investors, Garfield Taylor encouraged GTI's current investors and others to solicit new investors in exchange for commission payments based on the amount ultimately invested. In addition, when GIT needed to increase cash flow, Garfield Taylor offered "specials" in which he invited existing investors to invest additional funds for a limited period of time (usually 3 months) at a higher interest rate than the investor was previously receiving. At the end of the "special" period, GTI and Garfield Taylor often urged investors to keep their money with the company.*

Answer:   Garfield denies as phrased the allegations in paragraph 28.

29.      *King and Mitchell worked for GTI as independent contractors. Specifically, King and Mitchell promoted GTI's investments, solicited new investors and referred multiple potential investors to the company. In return for these services, King and Mitchell each received thousands of dollars in commission payments from GTI based on the amounts of money ultimately invested.*

Answer:   Garfield admits the first sentence in paragraph 29 but denies as phrased the remaining allegations.

B.     **GTI and Garfield Taylor Lured Investors With Material Misrepresentations.**

30.      *From at least 2005 until 2010, Garfield Taylor communicated with potential investors in person and over the telephone and made presentations where he urged individuals to invest in GTI through any available means, including their personal savings, retirement funds, and by refinancing their homes.*

Answer:   Denied as phrased.

31.      *In these presentations, Garfield Taylor's description of GTI's business and how it would use investor funds varied depending on the circumstances. Regardless of how Garfield Taylor portrayed GTI's business or use of investor proceeds, he assured investors that they were assuming very little risk. These representations were materially false because GTI's primary source of revenue was high-risk naked options trading that resulted in losses that overwhelmed any gains. Garfield Taylor, as GTI's CEO and sole shareholder, knew that these statements were materially false because he controlled GTI's brokerage and bank accounts.*

**Answer:** Garfield denies making "materially false representations"; therefore,

he denies the allegations in paragraph 31.

32.    *To provide additional comfort to prospective investors, Garfield Taylor frequently emphasized his prior work experience at Fannie Mae and his history of paying interest to his current investors. These representations were materially misleading because Garfield Taylor did not trade options for Fannie Mae, and his history of making "interest" payments to investors was not indicative of the successfulness of GTI's business given the fact that the payments were largely a Ponzi-like return of investor capital.*

**Answer:** Garfield denies as phrased the first sentence in paragraph 32. Garfield

denies making "materially false representations"; therefore, he denies the remaining

allegations in paragraph 32.

33.    *Garfield Taylor and GTI made several additional material misrepresentations to investors regarding the risks of investing in GIT and the company's intended use of investor proceeds. For example, in connection with investments made in 2005 and 2007, Garfield Taylor falsely stated to Investor No. 1 from Lanham, Maryland, that GTI protects principal by maintaining a "reserve" account. In connection with investments made in September and December 2007, Garfield Taylor falsely told Investor No. 2 from Greenbelt, Maryland, that GTI employs a covered call trading strategy and the principal invested would remain in cash and stocks. In connection with an investment in the summer of 2008, Garfield Taylor represented. to Investor No. 3 from Mitchellville, Maryland that he had employed a covered call strategy for years, that an investment in GIT involved "minimal risk" and GIT could return 15 to 25 percent interest annually.*

**Answer:** Garfield denies making "material representations"; therefore, he

denies the allegations in paragraph 33.

34.    *Garfield Taylor knew that these statements were materially false because, as GTI's sole owner and CEO who controlled GTI's bank and brokerage accounts, Garfield Taylor knew that GTI did not maintain a reserve account or employ a covered call strategy. Rather, Garfield Taylor knew that investor funds were traded in high-risk options or distributed to himself, earlier investors, and others. Furthermore, Garfield Taylor knew, or was reckless in not knowing, that GTI had operated at a net loss since at least 2005.*

**Answer:** Garfield denies making "materially false" statements; therefore, he

denies the allegations in paragraph 34.

35.     *In connection with an investment in May 2008, Garfield Taylor told Investor No. 4 from Upper Marlboro, Maryland, that an investment with GTI is "guaranteed" and is as safe as an FDIC insured account. Garfield Taylor knew that these statements were materially false because GTI investments were subject to market risk and were not insured.*

**Answer:   Denied.**

36.     *Moreover, certain investors were provided agreements that falsely stated that GTI's promissory notes were insured and collateralized. For example, investor agreements prepared by GTI dated March 7, 2008 (with respect to Investor No. 5 from Cheltenham, Maryland), November 6, 2008 (with respect to Investor No. 6 from Washington, D.C.) and April 28, 2009 (with respect to Investor No. 7 from Alexandria, Virginia), falsely stated, "Loans are insured and collateralized by AIG & New York Life Insurance for Seven Million Dollars. Loans are also collateralized by Stock and Cash of equal value of client's loan amount." In investor agreements dated November 6, 2008 (with respect to Investor No. 6 from Washington, D.C.) and July 27, 2009 (with respect to Investor No. 8 from Clinton, Maryland), Garfield Taylor and GTI represented that the investor's note was "collateralized and secured" by property that neither GTI nor Garfield Taylor owned. Garfield Taylor knew that these statements in the agreements were materially false because, as GTI's founder, CEO and sole owner, he knew that GTI did not insure the principal invested or collateralize the loans with stock, cash, real estate or otherwise.*

**Answer:   Garfield denies that the agreements were "false," "falsely stated," or that he made "materially false" statements; therefore, he denies the allegations in paragraph 36.**

37.     *Garfield Taylor and GTI also materially misrepresented GTI's profitability. For example, in connection with an investment made in November 2008, Garfield Taylor told Investor No. 9 from Germantown, Maryland, that, in light of the fact that GTI could pay a 20% return, "you can only imagine how much we make." Similarly, in connection with an investment made in May 2008, Garfield Taylor told Investor No. 4 from Upper Marlboro, Maryland that GTI typically generates a return in excess of 40 percent from securities trading. Garfield Taylor knew that these statements were materially false because he did not track the profitability of his options trading and had no basis for believing that GTI could pay a 20% interest rate based on revenue generated by the company. In addition, Garfield Taylor knew, or was reckless in not knowing, that GTI had operated at a net loss since at least 2005.*

**Answer:**   Garfield denies that he "materially misrepresented" or that he made

"materially false" statements; therefore, he denies the allegations in paragraph 37.

38.   *Furthermore, contrary to Garfield Taylor's interest payment
promises, GTI operated as a Ponzi scheme: Garfield Taylor and GTI used the
principal invested by later investors to make interest payments to earlier
investors.*

**Answer: Denied.**

39.   *Specifically, Garfield Taylor deposited investor funds in bank
accounts, from which he made payments to prior investors. He transferred most
of the remaining funds to an online brokerage account. Garfield Taylor and
Maurice Taylor traded, among other things, put and call options in that account.
Although the account occasionally earned trading profits, over time it suffered
overwhelming losses. Garfield Taylor did not disclose to investors that GTI did
not generate profits sufficient to cover the promised interest payments or that
he used the principal invested by later investors to make interest payments to
earlier investors. This failure to disclose the Ponzi-like nature of GTI's operations
deprived investors of material information relevant to their decision to invest in
GTI.*

**Answer:**   Denied as phrased.

40.   *In addition, this circular use of investor proceeds was
deceptive in nature because it created a false appearance that GTI was
prospering and yielding profits to investors when in fact it was operating
at a loss.*

**Answer:**   Denied.


II.   **Gibraltar Asset Management Group, LLC**

41.   *In late 2007 and early 2008, Garfield Taylor, together with
Dailey, King, Maurice Taylor and Randolph Taylor, conceived and organized
GAM and thereby expanded the GTI scheme substantially. Mitchell joined GAM
in July 2008 as Executive Vice President of Strategic Planning and in February
2009 replaced King as President.*

**Answer:**   Garfield denies all allegations related to a "scheme"; therefore, he

denies all allegations in paragraph 41.

42.   *Garfield Taylor, Dailey, King, Maurice Taylor and Randolph*

> Taylor held GAM out to investors as a company that followed a strict covered call investment strategy, meaning a strategy of writing (selling) call options while holding the underlying security. They portrayed GAM as a distinct company from GTI, with multiple layers of oversight and specific safeguards to protect investor principal.

**Answer:** Denied.

> 43.   In reality, Garfield Taylor controlled and managed GAM almost single-handedly. He comingled the assets of GAM and GTI and operated the two entities as a joint Ponzi scheme. From 2008 until 2010, GAM raised over $11.4 million from approximately 18 investors from Maryland, Washington, D.C. and Georgia, including an $8 million investment from a Washington, D.C. - based children's charity.

**Answer:**   Garfield denies all allegations related to a "scheme"; therefore, he

denies all allegations in paragraph 43.

> A.   **GAM's Unregistered Securities Offering and Solicitation of Investors**

> 44.   From 2008 until 2010, GAM and Garfield Taylor offered securities in the form of promissory notes in an integrated and unregistered offering with GTI. GAM's promissory notes provided for interest to be paid quarterly at an annual rate of 15 to 20 percent or more depending on the amount invested.

**Answer:**   Garfield denies that the loans were securities; therefore, he denies

the allegations in the first sentence of paragraph 44. With respect to the terms

contained in the promissory notes, Garfield states that the notes speak for themselves.

Allegations inconsistent with the terms of the notes are denied.

> 45.   The promissory notes issued by GAM are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)]. The money invested by purchasers of the GAM promissory notes was consideration for a contract, transaction, or scheme whereby parties invest in a common enterprise that was offered, sold and/or promoted by GAM and Garfield Taylor with the expectation of profits derived through the efforts of others.

**Answer:**   Garfield denies that the promissory notes were securities; therefore,

he denies the allegations in paragraph 45.

>   46.    *GAM never filed a registration statement with the Commission and it did not provide investors with audited financial statements.*

**Answer:**   Admitted.

>   47.    *In order to promote the sale of the GAM promissory notes, Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor used the U.S. mail, electronic mail, and face-to-face meetings with potential investors located in Washington, D.C., Maryland, Virginia, Georgia and Pennsylvania. In addition, these defendants caused several investors to wire money to GAM for their investments through financial institutions outside Washington, D.C.*

**Answer:**   Denied as phrased.

>   48.    *From late 2007 to mid-2008, Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor jointly prepared GAM's marketing materials to present to potential investors. The principal document was a PowerPoint presentation (the "GAM PowerPoint"), which was drafted primarily by Dailey with the review, comment, and contribution of Garfield Taylor, King, Maurice Taylor and Randolph Taylor.*

**Answer:**   Garfield admits only that he assisted in preparing presentation

materials but lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 48.

>   49.    *The GAM PowerPoint was delivered to most of GAM's 18 investors and dozens of additional potential investors, either in face-to-face meetings and presentations or by mail in and outside of Washington, D.C. Some prospective investors also received a collection of research materials regarding covered call options, a list of "frequently asked questions" regarding covered calls, and GAM's unaudited financial statements. Dailey prepared the covered call research materials and the "frequently asked questions."*

**Answer:**   Upon belief, admitted.

>   50.    *King directed Randolph Taylor to mail dozens of copies of the GAM PowerPoint to potential investors. In addition, Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor attended sales meetings with potential investors at which Garfield Taylor presented the GAM PowerPoint, including meetings in June 2008 with a children's charity in Washington, D.C. and an investment club in Philadelphia. Similarly, King, Dailey and Randolph Taylor attended a meeting in late-2008 with a Baptist Church in Maryland at which*

*Garfield Taylor presented the GAM PowerPoint.*

**Answer:** Garfield admits only that he attended meetings and participated in giving discussions but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 50.

51.     *At the June 2008 meetings with the children's charity and with the investment club in Philadelphia, Pennsylvania, Maurice Taylor gave presentations regarding GAM's claimed covered call strategy, consistent with statements in the GAM PowerPoint. Investors in these meetings were advised through the GAM PowerPoint that GAM followed a strict covered call investment strategy, which could be expected to generate profits in any market and protect the principal invested.*

**Answer:** Garfield admits only that he attended meetings and participated in giving discussions but denies the remaining allegations in paragraph 51 as phrased.

**B.     Material Misrepresentations to Investors**

52.     *From 2008 until 2010, GAM, with the assistance of Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor, prepared and distributed GAM's marketing materials to potential investors, which were riddled with materially false and misleading statements. For example, GAM, through its use of the GAM PowerPoint, falsely stated that GAM implemented a "covered call" trading strategy. The PowerPoint stated:*

- *"By implementing our proprietary Covered Call strategy, our managers pay below market value for thousands of premium, brand name stocks, giving our investments unparalleled downside protection, yet allowing us to obtain profits if the stock price increases, doesn't move at all, or even goes down" (emphasis in original);*

- *"We don't buy options: we sell them."*

**Answer:** Garfield denies making "materially false and misleading statement"; therefore, he denies the allegations in paragraph 52.

53.     *Similarly, GAM's "Frequently Asked Questions" stated, "Gibraltar's proprietary strategy only uses Call options, specifically, 'Covered Call Options.' Gibraltar does not buy options; we sell them." (emphasis in original)*

**Answer:**   Garfield states that the document speaks for itself. Allegations

inconsistent with the document are denied.

54.    In February 2009, Garfield Taylor, on behalf of GAM, also
provided a letter to a Baptist church in Maryland that was contemplating a one
million dollar investment, in which he wrote that GAM had successfully
implemented its proprietary covered call strategy.

**Answer:**   Garfield states that the document speaks for itself. Allegations

inconsistent with the document are denied.

55.    In reality, as Garfield Taylor knew, GAM did not follow a covered
call strategy. Instead, Garfield Taylor and Maurice Taylor traded investor assets
by purchasing high-risk naked put and call options. Unlike a covered call
strategy, which entails selling call options while hedging potential downside risk
through ownership of the underlying stock, the Taylors purchased call (and
sometimes put) options that provided the potential for unlimited losses of the
purchase price of the options, in the event that they were allowed to expire
before being exercised or sold. Thus, the strategy employed by the Taylors
involved far greater downside risk than a covered call strategy.

**Answer:**  Denied.

56.    By no later than November 2008, Dailey, Randolph Taylor and
King were aware that GAM had not followed a covered call investment strategy.

**Answer:**   Garfield lacks knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 56.

57.    Maurice Taylor, GAM's Chief Investment Officer, was always
aware that he did not sell covered calls on behalf of GAM and knew, or was
reckless in not knowing, that GAM was not following this strategy in general.

**Answer:**   Garfield lacks knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 57.

58.    In addition to material misrepresentations regarding the
company's investment strategy, GAM, through its use of the GAM PowerPoint,
stated that investors would receive a "15-20% annual return." This statement
was materially misleading because it implied that GAM had a reasonable basis
for believing that it could generate profits sufficient to cover 15 to 20 percent

*interest payments to investors. In fact, GAM had no such basis because GAM's principal trader, Garfield Taylor, did not track the rate of return that he achieved in his prior trading.*

**Answer:**   Garfield denies that GAM made "material misrepresentations"; therefore, he denies the allegations in paragraph 58.

*59.      Through its use of the GAM PowerPoint, GAM. also assured investors that an outside independent accountant would provide external oversight:*

- *"principal is . . . overseen by an outside independent accountant."*
- ***"Oversight by outside independent accountant. Accounts are monitored by outside independent accountant."*** *(emphasis in original)*

**Answer:**   Garfield states that the document speaks for itself and that allegations inconsistent with the document are denied.

*60.      These statements were materially false because GAM never retained an outside accountant to oversee or monitor its accounts. In fact, as Garfield Taylor, Dailey, King and Randolph Taylor knew, GAM did not hire an accountant at all until December 2008, at which time it retained an accountant for the entirely separate purpose of assisting in the preparation of unaudited financial statements.*

**Answer:**   Garfield denies that GAM made "materially false" statements; therefore, he denies the allegations in paragraph 60.

*61.      GAM, through its use of the GAM PowerPoint, also falsely represented to investors that GAM employed a reserve account and profit sweeping techniques to protect investors' principal from loss. The PowerPoint stated:*

- *"Sixty percent (60%) of the profits go to build our reserve account at M&T Bank to ensure its clients' principal balances are maintained" (emphasis in original);*
- *"Gibraltar sweeps its profits [from trading account] daily by our CIO to protect gains in the market and not put profits at risk."*
- *"Maintain your principal. Like an endowment, your principal will stay intact." (emphasis in original)*

**Answer:**  Garfield denies that GAM "falsely represented" information; therefore,

he denies the allegations in paragraph 61.

> 62.    *Garfield Taylor and King knew that these statements were materially false because GAM did not keep principal intact, maintain a reserve account or sweep profits. Rather, investor principal that they said was in a reserve account was used in on-going speculative trading, distributed to the Defendants, or recycled back to earlier investors. Dalley, Maurice Taylor and Randolph Taylor knew, or were reckless in not knowing, that these statements were false.*

**Answer:**  Garfield denies that GMA's PowerPoint was "materially false";

therefore, he denies the allegations in paragraph 62.

> 63.    *Finally, GAM, through its use of the GAM PowerPoint, falsely represented that GAM's covered call trading strategy generated consistent monthly cash flow and was virtually immune to market fluctuations and other sources of risk. The GAM PowerPoint stated:*

> - *"Gibraltar managers are able to still profit trading equity options IN SPITE OF interest rate fluctuations, inflation, deflation, or any political considerations" (emphasis in original);*

> - *GAM "managers make money trading equity options in UP, DOWN or SIDEWAYS markets. Risk is ALWAYS LIMITED" (emphasis in original);*

> - *"The beautiful thing about our equity option trading strategy is that we totally control our downside risk."*

**Answer:**  Garfield denies that GMA made "false representations"; therefore, he

denies the allegations in paragraph 63.

> 64.    *A similar representation was made in GAM's "Frequently Asked Questions":*

> - *"Is Options trading risky? No. The power of options lies in their versatility. Options enable investors to adapt or adjust their positions according to any situation that arises. Options can be as speculative or as conservative as an investor chooses. . . . "*

**Answer:**  Garfield states that the document speaks for itself.  Allegations

inconsistent with the document are denied.

Garfield Taylor's Answer to Complaint
Page 20 of 33

65.     *Garfield Taylor, King, Dailey, Maurice Taylor and Randolph Taylor knew, or were reckless in not knowing, that the statements in Paragraphs 63 and 64 were materially false and misleading because, even if GAM had implemented a covered call strategy (which it did not), this strategy would have been subject to market risk just like any other investment. Furthermore, the investment strategy that GAM did employ (purchasing naked puts and calls) was a far riskier strategy that was completely subject to market risk.*

**Answer:**   Garfield denies that the documents were "materially false; therefore,

he denies the allegations in paragraph 65.

66.     *Garfield Taylor, King, Dalley, Maurice Taylor and Randolph Taylor each received at least $20,000 in "owners distributions" from GAM after the company had successfully solicited and received significant investor funds by means of the material misrepresentations discussed in Paragraphs 52 through 65.*

**Answer:**   Garfield denies receiving funds by means of "material

misrepresentations"; therefore, he denies the allegations in paragraph 66.

### C.     Garfield Taylor Made Additional Materially False Statements to Investors

67.     *In addition to the group meetings with potential institutional investors at which Garfield Taylor presented the GAM PowerPoint (Paragraphs 49 through 51), Garfield Taylor also made materially false statements to individual investors when he met with them in and outside Washington, D.C. to encourage their investment in GAM. Those false statements include:*

- *Beginning in June 2009, assuring Investor No. 10 from Lanham, Maryland several times that the principal of his investment in GAM would "never get touched" and that the investor need not worry about loss or reduction of principal because it was protected;*

- *In August 2009, representing to Investor No. 11 from Laurel, Maryland that the principal that she invested would remain safe because it would be held at a trust company and GAM would only trade on the interest generated; and*

- *In the fall of 2009, telling Investor No. 12 from Frederick, Maryland that GAM employs a covered call strategy and the risk associated with an investment in GAM is a "2" on a scale of 1 to 10.*

**Answer:**   Garfield denies making "materially false statements"; therefore, he

denies the allegations in paragraph 67.

68.      *Garfield Taylor knew that these statements were materially false because, as GAM's CEO and controlling member, he knew that GAM traded and distributed investor principal and did not place investor principal with a trust company. In addition, Garfield Taylor knew that GAM did not employ a covered call trading strategy, and instead employed a high-risk naked options strategy.*

**Answer:**   Garfield denies making "materially false" statements; therefore, he

denies the allegations in paragraph 68.

**D.      Garfield Taylor Provided a Potential Investor with a Fake Letter of Recommendation**

69.      *In February 2009, Garfield Taylor also provided at least one prospective investor (a Baptist church in Maryland) with a fake "letter of recommendation" from Charles Schwab. This letter, which appears on Charles Schwab letterhead and purports to be signed by a Charles Schwab registered representative, describes GTI's business with Charles Schwab and states that GTI was "instrumental in the development of CyberTrader Pro/ Schwab Streetsmart Pro."*

**Answer:**   Denied.

70.      *The letter also states that Charles Schwab is the third-party broker dealer for GTI on multiple trading accounts and "will be expanding this partnership going forward." Furthermore, the letter concludes by stating that Charles Schwab "look[s] forward to continue doing business with Mr. Taylor and his new affiliate firm, Gibraltar Asset Management Group, LLC, in this exciting venture in the future."*

**Answer:**   Garfield states that the document speaks for itself. Allegations

inconsistent with the document are denied.

71.      *This letter was not prepared by anyone at Charles Schwab. Rather, it is a fabrication.*

**Answer:**   Denied.

72.      *In June 2008, Garfield Taylor requested that Charles Schwab's offices in Fishers, Indiana issue a letter on behalf of GTI containing the exact*

Garfield Taylor's Answer to Complaint
Page 22 of 33

*language contained in the body of the letter sent to the prospective investor.*

**Answer:**   Garfield lacks knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 72.

73.   *Charles Schwab, however, refused to provide the proposed letter
and instead issued a letter to Garfield Taylor containing only factual information
about GTI's account history that in no way endorsed GTI or Garfield Taylor.*

**Answer:**   Denied.

74.   *Nevertheless, in February 2009, Garfield Taylor provided a
fabricated letter, containing materially false and misleading statements; to a
prospective investor that included the language originally proposed by Garfield
Taylor, but rejected by Charles Schwab.*

**Answer:**   Denied.

**E.**       **Benjamin Dailey Made Materially Misleading Statements to Investors**

75.   *Dailey communicated with potential investors and sent
numerous e-mails in and outside Washington, D.C. to encourage investments in
GAM. At least two of those e-mails sent to Maryland contained materially false
and misleading statements.*

**Answer:**   These allegations are not directed to Garfield.

76.   *In an e-mail dated August 23, 2008, Dailey made a materially
false statement to Investor No. 13 from Hyattsville, Maryland when he
encouraged an investment in GAM by stating: "We have helped many of [our]
clients generate more income from their investment with us in their retirement
than they received while working full-time." Dailey knew this statement was
false because, at the time the e-mail was written, GAM had been operating for
only three months and had made few interest payments.*

**Answer:**   These allegations are not directed to Garfield.

77.   *In July 2009, Dailey convinced Investor No. 10, a retiree from
Lanham, Maryland, to invest nearly his entire retirement savings (over
$780,000) with GAM. In response to questions raised by the potential investor
about GAM, prior to investing, Dailey wrote this investor an e-mail including
multiple materially misleading or false statements about GAM.*

**Answer:**   These allegations are not directed to Garfield.

78.   *Specifically, in an e-mail from Dailey dated July 6, 2009, Dailey*

*assured this investor that "we [GAM] . . . stick to our 'covered call' investment strategy." In truth, however, Dalley had learned by November 2008 that GAM had not followed a covered call trading strategy and had instead engaged in highly speculative naked options trading. Moreover, without any factual basis, Dailey also wrote that GAM had "taken the internal measures to strictly regulate our traders and accounting to ensure that our investor's investments are safe." Dalley's material misrepresentations succeeded in inducing the investment: the investor replied on July 7, 2009, that Dalley's response "was very encouraging" and that Dailey "clearly understood [his] concern based on Bernie Madoff and other publicized scams."*

**Answer:**   These allegations are not directed to Garfield.

### III.   Trading in Other People's Brokerage Accounts

*79.      In addition to soliciting funds through GTI and GAM, Garfield Taylor offered his trading services to various individuals. In September and October 2010, Garfield Taylor convinced at least three individuals to give him the username and password to their online brokerage accounts in order for Garfield Taylor to place trades in those accounts on a discretionary basis in exchange for a share of any profits generated.*

**Answer:**   Denied as phrased.

*80.      For these services, Garfield Taylor received a percentage of the profits generated. While this trading appears to have generated pockets of profits (for which Garfield Taylor was compensated), for at least one investor from Lanham, Maryland, nearly her entire account (originally worth $450,000) was lost in a matter of two months (September and October 2010) as the result of Garfield Taylor's trading.*

**Answer:**   Garfield denies that he "convinced" people to give him their

username and password and therefore denies the allegations in the first sentence in

paragraph 80.  Garfield lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations.

*81.      Despite having effected numerous securities transactions for the accounts of others, Garfield Taylor was not licensed as a broker.*

**Answer:**   Garfield denies that he effected "securities transactions"; therefore,

he denies the allegations in paragraph 81.

Garfield Taylor's Answer to Complaint
Page 24 of 33

IV.     **Garfield Taylor Misappropriated Investor Funds**

82.     Between 2005 and 2010, Garfield Taylor diverted and misappropriated approximately $5 million from GTI and GAM accounts for personal gain, including $73,000 to the private school that his children attended.

**Answer:** Denied.

83.     During this same period, Garfield Taylor made payments to his family and friends from GTI and GAM investor funds. These recipients include, but are not limited to, Relief Defendants The King Group, LLC ($62,893), Marketing and Financial Consultants, Inc. ($202,600) and Reverb Enterprises, LLC ($165,635). The payments were not justified by any bona fide business purpose, and the recipients therefore had no right to receive them.

**Answer:** Denied.

V.     **GTI and GAM Operated as a Joint Ponzi Scheme**

84.     Garfield Taylor operated GTI and GAM as a joint Ponzi scheme. In this regard, Garfield Taylor, through GTI and GAM, distributed to investors over $12.5 million in interest payments between 2005 and 2010, all or nearly all of which were made from investor funds rather than from legitimate profits.

**Answer:** Denied.

85.     Trading profits were the only significant source of potential revenue for GTI and GAM. However, for every year from 2005 to 2010, securities trading on behalf of GTI and GAM generated a net loss. Nevertheless, the companies continued to make interest payments to investors using principal invested by later investors.

**Answer:** Denied as phrased.

86.     GTI's and GAM's net trading profits (losses) and aggregate interest payments to investors were as follows:

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Net Trading Profits (Losses) | ($2,138,303) | ($1,170,253) | ($2,458,890) | ($733,205) | ($2,594,092) | ($298,032) |
| Interest Payments to Investors | $510,141 | $1,107,534 | $1,988,878 | $2,939,474 | $4,624,758 | $1,417,181 |

**Answer:**   Garfield lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 86.

> 87.     *Garfield Taylor relied upon new investor deposits to meet his interest payment obligations to previous investors. For example, on October 5, 2009, Investor No. 10 from Lanham, Maryland wired approximately $590,000 to GAM as an investment. Prior to receiving this investment, the balance in GAM's bank account was less than $1,000. The day after receiving this investment, Garfield Taylor wrote a $4,250 interest payment check to another GAM investor from Washington, D.C. and a $60,000 check to GTI's operating account. The following day, Garfield Taylor wrote a $1,875 interest payment to a third GAM investor from Upper Marlboro, Maryland. Another day later, on October 9, Garfield Taylor wrote yet another check to GTI's operating account in the amount of $18,000. During this three-day period, the sole source of cash flow to the GAM bank account was the single investor wire from Investor No. 10.*

**Answer:**   Denied.

> 88.     *Similarly, on January 26, 2010, Investor No. 2 from Greenbelt, Maryland wired $74,000 to GAM as part of a self-directed IRA investment. This deposit increased the balance in GAM's account from approximately $3,300 to approximately $77,000. Three days later, prior to any subsequent deposits in the account, Garfield Taylor wrote a $6,817 interest check to another GAM investor from Washington, D.C. Also prior to any subsequent deposit in the account, on January 28 and February 2, Garfield Taylor wrote two checks to GTI transferring an aggregate of $50,000 to GTI's bank accounts. All of these payments were funded from the $74,000 investment.*

**Answer:**   Garfield denies that the wire was made as part of an investment; therefore, he denies the allegations in paragraph 88.

> 89.     *On April 7, 2010, Investor No. 12 from Frederick, Maryland wired $425,000 to GAM as part of a self-directed IRA investment. Prior to this deposit the balance in GAM's account was approximately $2,900. That same day, prior to any further deposits in the account, Garfield Taylor wrote a $105,000 check to another investor from Bethesda, Maryland denoted as "Principal and interest Paid-in-Full" and wrote a $25,000 interest check to another GAM investor from Washington, D.C. But for the $425,000 investment, GAM would have had insufficient funds to meet these payment obligations to other earlier investors.*

**Answer:**    Garfield denies that the wire was made as part of an investment; therefore, he denies the allegations in paragraph 89.

Garfield Taylor's Answer to Complaint
Page 26 of 33

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Section 17(a) of the Securities Act
### (Gil, GAM, Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor)

90.      *Paragraphs 1 through 89 are realleged and incorporated by reference herein.*

**Answer:**   Garfield is not required to respond to the allegations in paragraph 90.

91.      *In the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, GTI, GAM, Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor, directly or indirectly: (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) knowingly, recklessly or negligently engaged in a transaction, practice or course of business which operated or would operate as a fraud or deceit upon the purchaser.*

**Answer:**   Denied.

92.      *In addition to the misstatements and omissions alleged herein, GTI and GAM, through Garfield Taylor, engaged in deceptive conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of a fraudulent scheme. Specifically, they used funds received from new investors to make Ponzi-like interest payments to earlier investors in order to create the false appearance that GTI and GAM generated sufficient income to pay the above-market rates of return promised to investors. This deception was effected through the disbursement of payments and thus constitutes deceptive conduct distinct from any oral or written misrepresentations.*

**Answer:**   Denied.

93.      *By reason of the foregoing, GTI, GAM, Garfield Taylor, Dailey, King, Maurice Taylor and Randolph Taylor each violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].*

**Answer:**   Denied.

### SECOND CLAIM
### Section 10(b) of the Exchange Act and Rule 10b-5
### (GTI, GAM, Garfield Taylor and Dailey)

Garfield Taylor's Answer to Complaint
Page 27 of 33

94.     Paragraphs 1 through 89 are realleged and incorporated by reference herein.

**Answer:**   Garfield is not required to respond to the allegations in paragraph 94.

95.     In connection with the purchase or sale of securities by the use of the means or instrumentalities of interstate commerce or by the mails, GTI, GAM, Garfield Taylor and Dailey, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted to state a material fact necessary to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

**Answer:**   Denied.

96.     In addition to the misstatements and omissions alleged herein, GTI and GAM, through Garfield Taylor, engaged in deceptive conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of a fraudulent scheme. Specifically, they used funds received from new investors to make Ponzi-like interest payments to earlier investors in order to create the false appearance that GTI and GAM generated sufficient income to pay the above-market rates of return promised to investors. This deception was effected through the disbursement of payments and thus constitutes deceptive conduct distinct from any oral or written misrepresentations.

**Answer:**   Denied.

97.     By reason of the foregoing, GTI, GAM, Garfield Taylor and Dailey violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**Answer:**   Denied.

### THIRD CLAIM
#### Section 20(a) of the Exchange Act
#### (Garfield Taylor)

98.     Paragraphs 1 through 89 are realleged and incorporated by reference herein.

**Answer:**   Garfield is not required to respond to the allegations in paragraph 98.

99.     Through the conduct described above, Gil and GAM violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**Answer:** Denied.

100.   *When Gil and GAM violated Section 10(b) of the Exchange Act and Rule 10b-5, Garfield Taylor had the power to control, and did control, the conduct of GTI and GAM. Garfield Taylor was a "controlling person" within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with regard to GTI and GAM.*

**Answer:** Denied.

101.   *Because Garfield Taylor was a controlling person with regard to GTI and GAM and induced the acts constituting GTI's and GAM's violations, but did not act in good faith, he is jointly and severally liable with and to the same extent as GTI and GAM for their violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will continue to act as a "controlling person" in connection with such violations.*

**Answer:** Denied.

**FOURTH CLAIM**
**Aiding and Abetting Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5**
**(Garfield Taylor, Dailey, King, and Randolph Taylor)**

102.   *Paragraphs 1 through 89 are realleged and incorporated by reference herein.*

**Answer:** Garfield is not required to respond to the allegations in paragraph 102.

103.   *Through the conduct described above, GTI and GAM violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].*

**Answer:** Denied.

104. *Garfield Taylor knowingly provided substantial assistance to GTI in GTI's violations of Section 10(b) of the Exchange Act and Rule 10b-5.*

**Answer:** Denied.

105.   *In addition, Garfield Taylor, Dailey, King, and Randolph Taylor knowingly provided substantial assistance to GAM in GAM's violations of Section 10(b) of the Exchange Act and Rule 10b-5.*

**Answer:** Denied.

Garfield Taylor's Answer to Complaint
Page 29 of 33

106.    *Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §
78t(e)], Garfield Taylor is deemed to be in violation of Section 10(b) of the
Exchange Act and Rule 10b-5 to the same extent as Gil and, unless enjoined, will
continue to aid and abet violations of those provisions.*

**Answer:**   Denied.

107.    *Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §
78t(e)], Garfield Taylor, Dailey, King, and Randolph Taylor are deemed to be in
violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent
as GAM and, unless enjoined, will continue to aid and abet violations of those
provisions.*

**Answer:**   Denied.


## FIFTH CLAIM
### Sections 5(a) and 5(c) of the Securities Act
### (GTI, GAM and Garfield Taylor)


108.    *Paragraphs 1 through 89 are realleged and incorporated by
reference herein.*

**Answer:**   Garfield is not required to respond to the allegations in paragraph 108.

109.    *GTI, GAM, and Garfield Taylor directly or indirectly made use of the means
or instruments of transportation or communication in interstate commerce, or of the mails,
to sell securities when no registration statement was in effect as to such securities and
no exemption from registration was available.*

**Answer:**   Denied.

110.    *GTI, GAM and Garfield Taylor directly or indirectly made use of the
means or instruments of transportation or communication in interstate commerce, or
of the mails, to offer to sell securities when no registration statement had been filed as
to such securities and no exemption from registration was available.*

**Answer:**   Denied.

111.    *By reason of the foregoing, GTI, GAM and Garfield Taylor have each
violated, and unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act
[15 U.S.C. §§ 77e(a) and 77e(c)].*

**Answer:**   Legal conclusion.

### SIXTH CLAIM

Garfield Taylor's Answer to Complaint
Page 30 of 33

## Section 15(a) of the Exchange Act
## (Garfield Taylor, King and Mitchell)

112.    *Paragraphs 1 through 89 are realleged and incorporated by reference herein.*

**Answer:**  Garfield is not required to respond to the allegations in paragraph 112.

113.    *Garfield Taylor made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities issued by GTI and GAM. Garfield Taylor was engaged in the business of effecting transactions in the securities of GTI and GAM for the account of others.*

**Answer:**  Denied.

114.    *Garfield Taylor also made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities in the brokerage accounts that he traded for other people. Garfield Taylor was engaged in the business of effecting transactions in securities for the account of others.*

**Answer:**  Denied.

115.    *King and Mitchell made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of securities issued by GTI. King and Mitchell were engaged in the business of effecting transactions in securities of GTI for the account of others.*

**Answer:**  Denied.

116.    *Garfield Taylor, King and Mitchell were not registered as brokers and were not associated with a registered broker.*

**Answer:**  Denied.

117.    *By reason of the foregoing, Garfield Taylor, King, and Mitchell violated, and unless enjoined will again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].*

**Answer:**  Denied.

## SEVENTH CLAIM
## Sections 206(1), (2) and (4) of the Advisers Act and Rule 206(4)-8
## (Garfield Taylor)

118.    *Paragraphs 1 through 89 are realleged and incorporated by*

*reference herein.*

**Answer:** Garfield is not required to respond to the allegations in paragraph 118.

119.  *Garfield Taylor, while acting as an investment adviser, and by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, knowingly or recklessly, employed devices, schemes, or artifices to defraud clients or prospective clients; knowingly or negligently engaged in transactions, practices, or courses of business which operated or operate as a fraud or deceit upon clients or prospective clients; and engaged in acts, practices, or courses of business which are fraudulent, deceptive, or manipulative.*

**Answer:** Denied.

120.  *Garfield Taylor made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to investors or prospective investors in a pooled investment vehicle; and Garfield Taylor otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.*

**Answer:** Denied.

121.  *Garfield Taylor violated, and unless enjoined will in the future violate, Advisers Act Sections 206(1), (2), and (4) [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 206(4)-8].*

**Answer:** Denied.

<u>EIGHTH CLAIM</u>
**Disgorgement from Relief Defendants**
**(Relief Defendants)**

122.  *Paragraphs 1 through 89 are realleged and incorporated by reference herein.*

**Answer:**   Garfield is not required to respond to the allegations in paragraph

122.

123.  *In the manner described above, each Relief Defendant received investor funds and/or ill-gotten gains for which they gave no bona fide consideration and to which they have no legitimate claim.*

**Answer:**   The allegations in paragraph 123 are not directed to Garfield.

124.    *The funds acquired by the Relief Defendants are traceable to the Defendants' wrongful acts and were acquired under circumstances in which it is not just, equitable or conscionable for Relief Defendants to retain the funds.*

**Answer:**   These allegations in paragraph 124 are not directed to Garfield.

125.    *As a result, the Relief Defendants have been unjustly enriched and should be required to return their ill-gotten gains.*

**Answer:**   These allegations in paragraph 125 are not directed to Garfield.

With respect to the "Prayer for Relief" section of the Commission's Complaint, Garfield asserts that the Commission is not entitled to the relief it seeks.

### GARFIELD TAYLOR'S REQUEST FOR RELIEF

Defendant Garfield Taylor respectfully request that the Court dismiss the Commission's Complaint with prejudice, award him attorney's fees and cost for defending this action, and award any such further relief favorable to Garfield Taylor.

Defendant Garfield Taylor hereby gives notice that he intends to and will rely upon such other and further defenses as may become apparent during the course of the litigation.

Dated this 14^(Th) day of March 2012

Garfield Taylor
6111 Rosemont Circle
Rockville, MD 20852
(240) 461-9567
*Defendant, pro se*

### CERTIFICATE OF SERVICE

I certify that on this ___14^(Th)___ day of ___March___ 2012, a copy of the foregoing **Answers of Garfield Taylor to Complaint** was served on all parties or their

Garfield Taylor's Answer to Complaint
Page 33 of 33


counsels via first-class U.S. mail:

Richard Hong, Esq.
Attorneys for Plaintiff SEC
100 F Street, N.E.
Washington, DC 20549

Garfield Taylor