# EXHIBIT 7

Randolph M. Taylor, II 30(b)(6)  September 5, 2012
Washington, D.C.

Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4   UNITED STATES SECURITIES        )

5   AND EXCHANGE COMMISSION,        )

6             Plaintiff,            )

7       v.                          ) Case No. 1:11-CV-02054-RLW

8   GARFIELD TAYLOR,                )

9   INCORPORATED, et al.,           )

10            Defendants and        )

11            Relief Defendants.)

12  - - - - - - - - - - - - - - - )

13                        Washington, D.C.

14                        September 5, 2012

15

16       Videotaped Deposition of RANDOLPH M. TAYLOR, II, a

17  30(b)(6) witness herein, called for examination by

18  counsel for the Plaintiff in the above-entitled matter,

19  pursuant to Notice, the witness being duly sworn by

20  CARLA L. ANDREWS, a Notary Public in and for the

21  District of Columbia, taken at the Securities and

22  Exchange Commission, 100 F Street, N.E., Washington,

Randolph M. Taylor, II 30(b)(6)　　　　　　　　　　　　　　September 5, 2012
Washington, D.C.

## Page 18

1　A. With respect to Reverb, again, I told you it was
2　an investment vehicle. It wasn't an individual business
3　in and of itself. There were LLCs created in the
4　restaurants to run those. But Reverb in and of itself
5　was a vehicle to invest into the restaurants, which we
6　found out wasn't the best way to go about it. So we had
7　to create our own LLCs to house our stakes in those.
8　Q. Now, were you, then, the 50 percent owner and
9　principal of Reverb?
10　A. Ben and I were 50 percent owners of Reverb, yes.
11　Q. 50/50?
12　A. Yes.
13　Q. Does that also suggest that you guys were
14　basically coequals?
15　A. That would indicate, yes.
16　Q. I am simply asking who was the boss within
17　Reverb.
18　A. I don't know. It is called a partnership for a
19　reason.
20　Q. And did you have any responsibilities with
21　respect to Reverb?
22　A. There were — you keep asking me the same

## Page 19

1　question expecting a different answer. Again, it wasn't
2　a — Reverb was an investment vehicle, period. There
3　weren't responsibilities to be divvied out. So our
4　responsibilities were within the restaurant. It was
5　simply a vehicle to get to that as a means to that end.
6　Q. Are you suggesting there was nothing to do with
7　respect to Reverb?
8　A. No.
9　Q. So as far as things to do, with respect to
10　Reverb, how were those responsibilities divvied up
11　between you and Ben?
12　　　MR. DOUMAR: I think he has asked and
13　answered it, but you can keep trying to answer the same
14　question.
15　　　THE WITNESS: I mean, I am going to answer
16　in the same way over and over again. What do you want
17　me to say?
18　　　BY MR. HONG:
19　Q. Listen to my —
20　A. I mean, not just what you want me to say. I am
21　telling you the truth. So that's just all I am going to
22　say.

## Page 20

1　　　MR. HONG: Fair enough. Mr. Doumar, if you
2　don't mind, you can object to form on something. But I
3　would rather you not make a lengthy objection or speech
4　more on that, okay. So I understand your objection.
5　　　MR. DOUMAR: Objection. Asked and answered.
6　　　MR. HONG: Thank you. That's better.
7　　　BY MR. HONG:
8　Q. The — what was the business purpose of Reverb?
9　　　MR. DOUMAR: Objection. Asked and answered.
10　But go ahead.
11　　　THE WITNESS: Again, I just answered that
12　question. An investment vehicle in the two restaurants,
13　which I previously named.
14　　　BY MR. HONG:
15　Q. No other business purpose?
16　A. There were no other business purposes.
17　Q. I want to now turn to Garfield Taylor. Who is
18　Garfield Taylor in connection with Reverb?
19　A. In connection with Reverb, he invested in — he
20　— we took a loan from Garfield Taylor to invest in
21　restaurants with the agreement that we — that we would
22　pay him back should we — when we turn profits on the

## Page 21

1　restaurants.
2　Q. Now, you are related to Garfield Taylor, right?
3　A. That is a well-known fact, yes.
4　Q. What is your relationship?
5　A. He is my uncle.
6　Q. And with respect to Reverb, what did Garfield
7　Taylor do, if anything?
8　A. He did nothing. He invested. Again, he loaned
9　us money to invest in these restaurants.
10　Q. Was it Garfield Taylor's idea that you guys
11　create this LLC for your restaurants?
12　A. No.
13　Q. And are you aware of any entity called Garfield
14　Taylor, Inc.?
15　A. I am.
16　Q. What is Garfield Taylor, Inc. or what was
17　Garfield Taylor, Inc.?
18　A. It was the business run by my uncle.
19　Q. What kind of business?
20　A. The — well, when I was employed by Garfield
21　Taylor, it was on the construction — I was — I worked
22　for the construction side of the business, which

6 (Pages 18 to 21)

Randolph M. Taylor, II 30(b)(6)
Washington, D.C.
September 5, 2012

### Page 26

1  Q. Yes.
2  A. He was a sole proprietor of that company, was he
3  not?
4  Q. I am asking you the questions.
5  A. I don't know.
6      MR. DOUMAR: Just listen to his questions
7  and answer his questions.
8      BY MR. HONG:
9  Q. My question — since you mentioned that Garfield
10 Taylor and GTI were essentially one, I am curious about
11 what you meant by that.
12 A. Well, you say like my interactions, like my
13 interactions were — with Reverb were exactly as I told
14 you as a mechanism to invest in restaurants. I don't
15 understand what you mean by in terms of like our
16 dealings with Garfield as opposed to Garfield Taylor,
17 Inc. — the difference there.
18 Q. When I talk about Garfield Taylor, Inc., I am
19 talking about the entity. I am not talking about the
20 man himself. Do you follow what I am saying?
21 Individually.
22 A. I understand what you mean.

### Page 27

1  Q. So my question was — and I am going to come back
2  with it. But the more interesting point that you made
3  and I want to follow-up is, I asked about Reverb's
4  interaction with Garfield Taylor, Inc. And you
5  mentioned as part of that answer that Garfield Taylor,
6  the man, was essentially the same as Garfield Taylor,
7  Incorporated, as far as I understood it. So I want you
8  to explain to me what you meant by that.
9      MR. DOUMAR: Objection. Asked and answered.
10     THE WITNESS: I don't know. My point —
11 that's it. I dealt with — I didn't deal with Garfield
12 in terms of entities. Like I dealt with him as an
13 individual. So he was my uncle. That's a family
14 relationship.
15     BY MR. HONG:
16 Q. Maybe we are miscommunicating here. I am talking
17 not you personally Randolph Taylor. I am talking as
18 Reverb — as a principal of Reverb.
19 A. And I have answered this is that it was a — we
20 took a loan from Garfield Taylor. I do not recall
21 whether it was from Garfield Taylor Inc. or Garfield
22 Taylor, the individual. I don't — I don't remember.

### Page 28

1  But to invest in these restaurants as far as I know.
2  And that's simply it. I don't recall whether it was
3  from personal like his profits or whatever. I don't
4  know.
5  Q. Let me make sure I understand your answer. Any
6  interactions, dealings with — between Reverb and
7  Garfield Taylor, Inc. would be related to the loans that
8  you have already spoken about that Mr. Garfield Taylor
9  provided to Reverb. Am I reading that correctly? Am I
10 understanding that correctly?
11 A. Can you repeat that?
12     MR. HONG: Would you read back the question?
13     (The record was read back as follows:
14     "Q: Let me make sure I understand your
15     answer. Any interactions, dealings with —
16     between Reverb and Garfield Taylor, Inc.
17     would be related to the loans that you have
18     already spoken about that Mr. Garfield
19     Taylor provided to Reverb. Am I reading
20     that correctly? Am I understanding that
21     correctly?")
22     THE WITNESS: Correct.

### Page 29

1      BY MR. HONG:
2  Q. Correct?
3  A. Correct.
4  Q. Let's now talk about GAM, Gibraltar Asset
5  Management. What were the interactions between — any
6  interactions between GAM and Reverb?
7  A. I don't remember there being any.
8  Q. I am going talk to you about number six, goods
9  and services provided by Reverb to Garfield Taylor and
10 his entities. Let's go one by one. What goods and/or
11 services were provided by Reverb to Garfield Taylor, the
12 man?
13 A. I don't recall there being any.
14 Q. What about as to Garfield Taylor, Inc.? What
15 goods and/or services were provided by Reverb to
16 Garfield Taylor, Inc.?
17 A. To the best of my knowledge, there were none.
18 Q. Finally, as to GAM, Gibraltar Asset Management
19 Group, what goods and/or services were provided by
20 Reverb to GAM?
21 A. To the best of my knowledge, none.
22 Q. I now want to talk to you about payments. You

8 (Pages 26 to 29)

Randolph M. Taylor, II 30(b)(6)                                September 5, 2012
                        Washington, D.C.

Page 126

1  know.
2  Q. Did Mr. Garfield Taylor ever give you money in
3  cash, not in check form, but in check?
4  A. I never received any check from Garfield.
5  Q. Did you receive any money that was originally
6  from Garfield Taylor or one of his entities but that
7  were actually cut from a check belonging to some other
8  person or some other entity?
9  A. No.
10 Q. Why was this agreement created? Why was this
11 written agreement created?
12 A. To assume — for Garfield to assume the loan that
13 he had given us to build the restaurants.
14 Q. So to provide all of these whereas clauses and
15 these assumptions, novations, a lot of legalese in it.
16 A. I am pretty sure it was — again, this is sheer
17 speculation. It is just a template that we filled out.
18 Q. Did you prepare this?
19 A. I did not.
20 Q. Then who prepared it?
21 A. I don't recall.
22 Q. Did Ben Taylor — Ben Dalley — I'm sorry,

Page 127

1  Benjamin Dalley prepare it?
2  MR. DOUMAR: Objection. Asked and answered.
3  THE WITNESS: Again, I don't recall.
4  MR. HONG:
5  Q. Was there a concern as of July 21, 2010, that
6  Garfield Taylor or his entities would not assume or
7  forgive the loan but for a written agreement that were
8  entered by the parties?
9  A. Explain.
10 Q. Were you concerned that if you did not put these
11 — the amounts — check amounts and these what you term
12 or what's termed as the loan amounts of 180,000, that
13 somehow you, Ben, and Reverb would not be protected
14 legally?
15 A. I don't recall that discussion having — all I
16 remember is us at that point saying like we should put
17 — I mean, this is everything both from — you know, at
18 this point, like obviously Reverb had already served its
19 purpose for us — I mean, it had served its purpose in
20 terms of the construction aspect of it with relation to
21 this. And we just — we just said, hey, we should
22 create this document so this money is out there and we

Page 128

1  can account for it.
2  Q. Did Mr. Garfield Taylor ask that this written
3  agreement be drawn up?
4  A. I don't recall. I am not going to speculate, but
5  I don't recall. I was really, really busy at the time.
6  Q. Did you consult a lawyer regarding this
7  agreement?
8  A. I did not personally, no.
9  Q. Did Ben Dalley consult a lawyer regarding this
10 agreement?
11 A. Not to my knowledge. I don't know.
12 Q. And after this agreement was executed, I think a
13 consideration for that was 10 dollars. That's the last
14 page of this — a check that Mr. Dalley wrote to
15 Garfield Taylor for 10 bucks. Do you see that?
16 A. Yeah.
17 Q. So you basically gave up 10 bucks for
18 Mr. Garfield Taylor to personally assume the loan amount
19 of $180,000; is that right?
20 A. That's what the document states.
21 Q. What goods or services were provided in addition
22 to the 10 dollars from Reverb to Garfield Taylor or any

Page 129

1  of his entities?
2  A. There were none. It was an assumption of a loan
3  that had been issued for the building of two
4  restaurants.
5  Q. I gather — I think you mentioned this before.
6  But I gather you had a significant conversation with
7  your uncle Garfield Taylor about the assumption of
8  $180,000?
9  A. I don't remember it being a significant
10 conversation. I mean, what — define significant.
11 Q. You had more than 10 minutes of conversation with
12 him, right?
13 A. A lot of that — I mean, I really wasn't part of
14 a lot of that conversation. I was part of some of it.
15 I don't really remember the in's and out's of it. With
16 him everything is long and verbose. So I don't remember
17 the exact specifics of it. We probably —
18 Q. Mr. Taylor, if you were not involved in these
19 discussions about —
20 A. I was involved —
21 Q. Who were involved? Tell me.
22 A. I don't recall the in's and out's of it — the

33 (Pages 126 to 129)

Randolph M. Taylor, II 30(b)(6)                                                September 5, 2012
Washington, D.C.

### Page 130

1  specifics of the conversation.
2    Q. Was Benjamin Dalley involved in these discussions
3  --
4    A. I was involved -- yes, he was. I was involved in
5  the conversation. I don't remember the specifics of
6  what was discussed outside of, you know, we agreed to
7  have this document drawn up.
8    Q. The point I am trying to -- what I am trying to
9  find out is how much discussion were there before
10 Mr. Garfield Taylor agreed to forgive the $180,000
11 amount?
12   A. I really don't recall. I really don't.
13   Q. What did you tell him the circumstances that
14 required forgiveness of $180,000?
15   A. The circumstances are the fact that we don't --
16 in good faith, like we don't see where we will be able
17 to pay that amount of money back. That was it.
18   Q. Explain this to me. Reverb did nothing for
19 Garfield Taylor, did nothing for Garfield Taylor
20 incorporated, did nothing for GAM, and it put in
21 $180,000 for Reverb. And it decided, okay, we are going
22 to forgive that $180,000?

### Page 131

1    A. That's what it says.
2    Q. After this loan assumption agreement was entered,
3  were there any further transactions or anything between
4  Reverb and Garfield Taylor or one of his entities?
5    A. Not to my knowledge.
6    Q. So all of those payments that we have gone over
7  became history for you. And you and Reverb had moved
8  on?
9    A. I mean, yes, there were no more transactions.
10       MR. HONG: Can you give me a minute? And we
11 may be done.
12       THE VIDEOGRAPHER: We are going off the
13 record. The time on the video is 8:55 p.m.
14       (A recess was held.)
15       THE VIDEOGRAPHER: Back on the record. The
16 time on the video is 9 o'clock p.m.
17       BY MR. HONG:
18   Q. So we spoke a little bit about your relationship
19 with Garfield Taylor. You are his nephew. And do you
20 have an understanding of the relationship between Ben
21 Dalley and Garfield Taylor?
22   A. Define relationship.

### Page 132

1    Q. Did you introduce Garfield Taylor to Ben Dalley?
2    A. I did.
3    Q. When did you do that?
4    A. I don't recall the exact time. This was a while
5  back. Maybe 2005, 2006 May.
6    Q. What?
7    A. Maybe 2005, 2006. I don't recall the exact time.
8    Q. What were the general circumstances?
9    A. What were the general circumstances?
10   Q. What were the circumstances that led you to
11 introduce Garfield Taylor to Ben Dalley?
12   A. I mean, Ben and I have been friends for a long
13 time. So in circumstances where we introduce, we saw,
14 blah, blah, blah. I don't remember the exact
15 circumstances, though. I mean it was a long time ago.
16 We have known each other for a long -- Ben and I have
17 known each other since we were like 14.
18   Q. Did you participate in any business with Ben
19 Dalley aside from GAM and Reverb?
20   A. Yeah. We have an apartment building in Columbia
21 Heights.
22   Q. Is that still existing?

### Page 133

1    A. It still exists, yes.
2    Q. When you say you have an apartment building, what
3  does that mean?
4    A. It is a three-unit rental property.
5    Q. And you run that?
6    A. I do not.
7    Q. What runs that?
8    A. Ben and his dad run that.
9    Q. Who are the owners?
10   A. It's an LLC.
11   Q. I understand. But who are the principals of the
12 LLC?
13   A. The principals -- well, when it first started?
14   Q. Today.
15   A. Today are -- I believe are Ben, his dad, and
16 Joseph Schmidt.
17   Q. Not yourself?
18   A. Not anymore, no.
19   Q. When did you get out?
20   A. Three years ago.
21   Q. Did you get a payment out?
22   A. We had a lot of money due on -- for property

CERTIFICATE OF NOTARY PUBLIC

I, Carla L. Andrews, the officer before whom the foregoing deposition was taken, do hereby certify that the witness, whose testimony appears in the foregoing deposition was duly sworn by me, that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewritten form under my supervision, that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto nor financially or otherwise interested in the outcome of the action.

_____
Carla L. Andrews, Notary Public for the
District of Columbia

My Commission Expires: January 14, 2014